**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re: | ) |
| | ) |
| GENERAL MOTORS CORPORATION | ) |
| DEX-COOL PRODUCTS LIABILITY | )   CIVIL NO. MDL-03-1562-GPM |
| LITIGATION | ) |
| | ) |
| THIS DOCUMENT PERTAINS TO: ALL | ) |
| CASES | ) |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

This cause is before the Court on a motion for class certification (Doc. 84). For the

following reasons, the motion is **DENIED**.

### INTRODUCTION

The matter before the Court concerns claims for breach of express warranties by Defendant

General Motors Corporation ("GMC") brought pursuant to the Magnuson-Moss Warranty-Federal

Trade Commission Improvement Act ("Magnuson-Moss Act"), Pub. L. No. 93-637, 88 Stat. 2183

(1975) (codified at 15 U.S.C. §§ 2301 - 2312 (1982) and other scattered sections of 15 U.S.C.). The

claims have been centralized in this Court by order of the Judicial Panel on Multidistrict Litigation

for coordinated or consolidated pretrial proceedings. A second amended consolidated class action

complaint ("Consolidated Complaint") filed in this Court on November 8, 2005, is the operative

complaint in these consolidated proceedings (Doc. 94). Federal subject matter jurisdiction is proper

pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 2310(d)(1)(B), inasmuch as the Consolidated

Complaint identifies at least one hundred named Plaintiffs and, according to the uncontroverted

allegations of the Consolidated Complaint, the amount in controversy, exclusive of interest and

costs, exceeds $50,000, computed on the basis of all claims to be determined in the suit.  *See* Doc. 94 ¶¶ 4-107, ¶ 2.  *See also* 15 U.S.C. § 2310(d)(3)(B)-(C); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1114 n.2 (7th Cir. 1979); *In re General Motors Corp. Dex-Cool Prods. Liab. Litig.*, No. CIVMDL-03-1562GPM, Civ. 05-10007-GPM, 2006 WL 644793, at *2 (S.D. Ill. Mar. 9, 2006).  *Cf. Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 957 (7th Cir. 1998).[1]

Plaintiffs, who are owners and lessees of vehicles manufactured by GMC, assert that their vehicles have been damaged by Dex-Cool, a factory-installed engine coolant manufactured according to a proprietary specification written by GMC, in breach of written warranties made to them by GMC in the owner's manuals that accompanied their vehicles and elsewhere.  The Consolidated Complaint alleges that in the owner's manuals GMC promised vehicle owners that

---

1.    The individual named Plaintiffs listed in the Consolidated Complaint are:  Sarah M. Adams; Delbert Alt, Jr.; David Armstrong; Jenny Artemus-Risner; Anthony Ashbrook; William Augustine, Jr.; Marsha Batchellor; Tina Batt; Ivett Benkovics; Mervin Bierman; Martha Bortz; Lori J. Bridges; Jeffrey Buenger; Richard Bunnell; Donna Candella; Robert W. Christensen; Sherry Dampier-Bunton; Christopher Debbie; Guy Devarney; Richard Dilbeck; John Dingman; Justin Doolittle; Shea Downing; Rufus Fields; Donald Fike; Caesar Fiorini; Daniel Flannery; Peter Freeland; Donald Fuller; Terry Garver; Michael J. Hamilton; Richard Hansen; Thomas Harbaugh; Michael Harnett; Gary Harrison; Alan Hedberg; George Heesh; Mark Henninger; Jason Herbst; Kristen Hughes; James Hughs; Louise Jarvis; William Johnson; Jeremy Kirkham; Kevin Kobbeman; Dennis Kopp; David Kowaleski; Melissa Kupfrian; Gustav Lachnit; Donna Lambert; Timothy Lauer; Deborah Lema; Kurt Lobmeyer; Lori Lennon; Denise Lombardino; Jamie L. Lowes; Brandon McDonald; Terry McDonald; Mary Ann McGreevey; Jeremy Michels; Tammy Miller; John Moeger; Alan Morganfield; Deborah Mosher; Edward J. Murphey; Marla New; Barry Newsome; Patrick O'Brien; Clifford Orrill III; George Parsons; Renee Pennington; Allison Pettus; Sandra Pointer; Patricia Pollock; Cinda Reid; Janice Robinett; John Roethel; Clint Rogers; Howard Rosenbloom; Michael J. Ryan; David Rynerson; Ronald Saresky; Todd Simmons; Barbara O. Smith; Michael Stein; James Steinmetz; Daniel Sturgeon; Gregory Sullivan; Joseph Tavernelli; Allen Taylor; Audra Thiel; Stacy Thomley; Michael Thompson; Mary Jo Thor; Brian Valente; Donald Varson; Janet Wagner; Marcia Walters; Mark Walters; Richard Wetzel; Craig Wheeler; Louis Williams; Jane Winans-Hall; and Michael Wyman.

factory-installed Dex-Cool would for a period of five years or 150,000 miles (or, for 1996 model year vehicles, 100,000 miles):  (1) give freezing protection down to -35 degrees Fahrenheit (-37 degrees Celsius); (2) give boiling protection up to 265 degrees Fahrenheit (129 degrees Celsius); (3) protect against rust and corrosion; (4) help keep the proper engine temperature; and (5) let the warning lights and gauges work as they should.  *See* Doc. 94 ¶ 118.  Plaintiffs contend that the foregoing statements in the owner's manuals constitute an enforceable express warranty.  *See id.* ¶¶ 116-17.[2]

Plaintiffs allege that, contrary to GMC's warranty, Dex-Cool damages vehicles in which it is installed in two ways.  First, Plaintiffs assert that Dex-Cool, which is designed to prevent corrosion of engine parts by allowing corrosion to form and then chemically reacting with the corrosion to stop it, is incompatible with the cooling system in certain GMC 4.3-liter engine vehicles because the cooling system in those vehicles is not designed to remain full of coolant.  *See* Doc. 94 ¶ 113; Doc. 86 at 6.  Because Dex-Cool cannot protect component parts that are not in constant contact with the coolant, Plaintiffs contend, GMC's 4.3-liter V-6 engines factory-equipped with

---

2.   Plaintiffs contend that GMC made certain additional warranties regarding Dex-Cool, although because it appears that Plaintiffs' request for class certification does not implicate those alleged warranties, the Court mentions them only in passing.  Specifically, the Consolidated Complaint alleges that GMC made a limited warranty applicable to all GMC vehicles registered and normally operated in the United States during a warranty period of 3 years or 36,000 miles which obligates GMC to correct any vehicle defect related to materials or workmanship occurring during the warranty period and which requires GMC to replace or repair all parts damaged by a defect related to materials or workmanship.  *See* Doc. 94 ¶¶ 120-122.  Also, Plaintiffs contend that on labels affixed in the engine compartment of certain GMC vehicles factory-installed with Dex-Cool, GMC warranted that Dex-Cool would meet a specified level of performance over a specified period of time.  According to the Consolidated Complaint, the labels stated:  "USE DEX-COOL COOLANT ONLY.  Your engine coolant does not require maintenance for 5 years or 100,000 miles (166,000 km) [for 1997 and later vehicles 150,000 miles (240,000 km)] if you add only DEX-COOL extended-life engine coolant.  See Owner's Manual for more information."  *Id.* ¶ 119.

Dex-Cool are unreasonably prone to developing corrosive sludge inside the cooling system. *See* Doc. 86 at 6. Second, Plaintiffs contend, Dex-Cool is chemically incompatible with the intake manifold gaskets factory installed in GMC's 3.1-, 3.4- and 3.8-liter V-6 engines, eventually eroding the gaskets and leaking out. *See id*. at 10-11. Plaintiffs allege that these defective conditions associated with Dex-Cool constitute a breach of GMC's express warranties to vehicle owners and lessees.

Pursuant to Rule 23(b)(3) and (c)(4)(A) of the Federal Rules of Civil Procedure, Plaintiffs ask the Court to declare on behalf of a class of GMC vehicle owners and lessees that GMC's representations concerning Dex-Cool set out in the owner's manuals for certain GMC vehicles constitute a "written warranty" within the meaning of the Magnuson-Moss Act, *see* 15 U.S.C. § 2301(6), and issue an injunction requiring GMC to honor that warranty. The proposed class is defined, with certain exceptions not material here, as follows:

> All consumers (except those in California, Missouri, and Texas) who purchased or leased any of the following GM vehicles, model years 1995 through 2004, that were factory-equipped with a 3.1-, 3.4-, 3.8- or 4.3-liter V-6 engine and Dex-Cool: Chevrolet and GMC S/T Blazer, Jimmy, Sonoma, S10 pickup; GMC Envoy; Buick Century, Rendezvous, Riviera, Park Avenue Regal, and LeSabre; Chevrolet Lumina and Lumina APV, Venture, Malibu, Monte Carlo, and Impala; Oldsmobile Alero, Bravada, Cutlass, Silhouette, Ninety-Eight, Eighty-Eight, and Intrigue; and Pontiac Trans Port, Grand Am, Montana, Grand Prix, Aztek, Bonneville and Grand Prix.

*See* Doc. 85 at 7. Plaintiffs further request that the Court resolve on behalf of the proposed class the two following issues:

> (1) Whether factory-equipped Dex-Cool is incompatible with the intake manifold gasket factory-installed in GM 3.1-, 3.4-, and 3.8-liter engine vehicles, model years 1995 through 2004 [Buick Century, Rendezvous, Park Avenue, Regal, and LeSabre; Chevrolet Venture, Malibu, Monte Carlo, Impala, Lumina and Lumina APV; Oldsmobile Alero, Cutlass, Silhouette, Ninety-Eight, Eighty-Eight, and Intrigue; and Pontiac Trans Port, Grand Am, Montana, Grand Prix, Aztek, Bonneville, and Grand

Prix]; and

(2) Whether factory-equipped Dex-Cool is incompatible with the cooling system in GM 4.3-liter engine vehicles, model years 1995 through 2000 [Chevrolet and GMC S/T Blazer, Jimmy, Sonoma, S10 pickup; GMC Envoy; and Oldsmobile Bravada].

*See id*. at 8.  The parties have filed extensive written submissions with respect to the issue of class certification.  The Court has reviewed those submissions carefully and conducted a hearing on class certification and now is prepared to rule.

**DISCUSSION**

### A.        Standing

At the outset the Court addresses GMC's argument that, because unnamed members of the proposed class have not been damaged, that is, incurred expenses for repairs to their vehicles for harm allegedly caused by Dex-Cool, they lack standing.  Although this argument has no merit, standing is an issue that implicates the Court's subject matter jurisdiction, and therefore the Court will discuss the issue briefly.  *See Smith v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1142 (7th Cir. 1994) ("Standing and ripeness are jurisdictional prerequisites.").  *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (a federal court must satisfy itself that the plaintiffs have standing because it implicates constitutional limits on the court's power); *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("[S]tanding remains . . . a limitation on the authority of a federal court to exercise jurisdiction."); *Carolina Cas. Ins. Co. v. Pinnacol Assurance*, 425 F.3d 921, 926 (10th Cir. 2005) (citing *Steel Co.*, 523 U.S. at 96-97) ( "Because constitutional standing is necessary to the court's jurisdiction, as a general rule it must be addressed before proceeding to the merits.").  *Cf. Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) (issues affecting a federal court's subject matter jurisdiction

are "fundamentally preliminary").

Federal courts are, of course, courts of limited jurisdiction whose adjudicatory authority stems from Article III of the United States Constitution. *See Abercrombie v. Office of Comptroller of Currency*, 833 F.2d 672, 674 (7th Cir. 1987). Article III allows federal courts to hear only "Cases" and "Controversies," *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005) (quoting U.S. Const. art. III, § 2, cl. 1), and "[o]ne of [the] landmarks, setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III . . . is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). *See also Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)) ("The standing requirement inheres in Article III of the Constitution, which requires that a party seeking to invoke the jurisdiction of the federal courts must present an . . . actual case or controversy."). To have Article III standing a plaintiff must show three things: an "injury in fact," that is, a concrete, particularized, and actual or imminent harm, not one that is conjectural or hypothetical; a fairly traceable causal connection between the harm and a defendant's complained-of conduct; and a likelihood that requested relief will redress the harm. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). *See also Johnson v. Allsteel, Inc.*, 259 F.3d 885, 887 (7th Cir. 2001) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) ("To satisfy Article III's standing requirements, a plaintiff must allege that he has sustained 'personal injury [in-fact] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'").[3]

---

3.     In addition to constitutional standing, federal courts have crafted a doctrine of prudential standing. Prudential standing has three components; it "encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized

In this case the Consolidated Complaint alleges that all of the named Plaintiffs have suffered damage to their automobiles caused by Dex-Cool.  *See* Doc. 94 ¶ 108.  Additionally, the clear import of the allegations of the Consolidated Complaint is that all owners and lessees of vehicles factory-equipped with Dex-Cool, if they have not already incurred expenses for repairs for harm to their vehicles caused by Dex-Cool, are in imminent danger of incurring such expenses by reason of GMC's refusal to pay for the damage Dex-Cool is alleged inevitably to cause to vehicles in which it installed.  These allegations of actual or imminent injury to all members of the proposed class are sufficient to satisfy the requirements of Article III standing.  *See Lujan*, 504 U.S. at 560 (constitutional standing is premised on the "invasion of a legally protected interest which is . . . concrete and particularized . . . and . . . actual or imminent"); *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) ("In order to establish standing for purposes of the constitutional 'case or controversy' requirement, a plaintiff . . . must show that he personally has suffered some actual or threatened injury[.]").  Whatever the merits of the claims before the Court, and this is an issue that is distinct, of course, from standing, *see Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1058 n.3 (7th Cir. 1994); *South E. Lake View Neighbors v. HUD*, 685 F.2d 1027, 1034 (7th Cir. 1982), the allegations of Plaintiffs' Consolidated Complaint are adequate to permit the Court to entertain the claims asserted therein.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits

---

grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen*, 468 U.S. at 751).  *See also Board of County Comm'rs of Sweetwater County v. Geringer*, 297 F.3d 1108, 1112 (10th Cir. 2002).  In this instance GMC's challenge to standing clearly implicates Article III standing, not prudential standing.

of the dispute or of particular issues.").

Finally, in the class-action context, standing is tested according to special rules.  Generally standing in a class action is assessed solely with respect to class representatives, not unnamed members of the class.  "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense."  1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:5 (4th ed. 2002 & Supp. 2006) (collecting cases).  *See also Bzdawka v. Milwaukee County*, 238 F.R.D. 469, 473 (E.D. Wis. 2006) (noting that "[i]n a class action, the unnamed class members are 'passive' in contrast to the named plaintiff, who actively prosecutes the litigation on their behalf"; thus, "standing analysis is concerned with whether the named plaintiff is properly before the court.").  Under the law of this Circuit, in fact, issues of class certification are to be resolved before issues of standing.  The United States Court of Appeals for the Seventh Circuit has instructed that "class certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing."  *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)).  "Thus the issue about Rule 23 certification should be treated first."  *Id*.  As the *Payton* court recognized, standing in a class action is demonstrated by proving that the prerequisites for class certification under Rule 23 of the Federal Rules of Civil Procedure are met.  Thus, standing is satisfied where it is shown that a class representative meets the requirements of Rule 23(a), particularly Rule 23(a)(3) and (a)(4).  *See Irving Trust Co. v. Nationwide Leisure Corp.*, 95 F.R.D. 51, 57 n.6 (S.D.N.Y. 1982) ("Generally, when the Rule 23(a) prerequisites are met, there will be standing, since those prerequisites demand that the plaintiff

alleged injury resulting from a class wrong."); 1 Conte & Newberg, *Newberg on Class Actions* § 2:7 (unnamed class members "need not make any individual showing of standing, because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.").  As will be discussed in the next section of this Order, the Court concludes that Plaintiffs satisfy the requirements of Rule 23(a), so that standing is proper in this case.

   **B.**   **Class Certification**

   **1.**   **Legal Standard**

   A party seeking certification of a class under Rule 23 of the Federal Rules of Civil Procedure must demonstrate that the proposed class meets all four requirements of Rule 23(a):  (1) the class is so numerous that joinder of the class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class as a whole ("typicality"); and (4) the representatives will fairly and adequately protect the class interests ("adequacy").  *See* Fed. R. Civ. P. 23(a)(1)-(4); *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002).  If a proposed class meets the prerequisites of Rule 23(a), it must then be shown that the class satisfies at least one of the three requirements of Rule 23(b) as well.  *See Hispanics United of DuPage County v. Village of Addison, Ill.*, 160 F.R.D. 681, 686 (N.D. Ill. 1995); *Hardin v. Harshbarger*, 814 F. Supp. 703, 706 (N.D. Ill. 1993).  "A party seeking class certification bears the burden of proving that each of the requirements under Rule 23 has been met, and a failure by the movant to satisfy any one of these prerequisite elements precludes certification."  *Westefer v. Snyder*, Civil Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *2 (S.D. Ill. Sept. 12, 2006)

(citations omitted).  "When appropriate . . . an action may be brought or maintained as a class action with respect to particular issues, . . . and the provisions of [Rule 23] shall then be construed and applied accordingly."  Fed. R. Civ. P. 23(c)(4).

A court has broad discretion to determine whether a proposed class meets the Rule 23 certification requirements.  *See Westefer*, 2006 WL 2639972, at *2.  In making this determination, Rule 23 should be construed liberally to support its policy of favoring the maintenance of class actions.  *See King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25-26 (7th Cir. 1975).  A court cannot consider the merits of the claims for relief asserted by the members of a proposed class, *see Rodriguez v. Ford Motor Credit Co.*, No. 01 C 8526, 2002 WL 655679, at *1 (N.D. Ill. Apr. 19, 2002) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)), although in evaluating class certification a court "must take into account 'the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements' and envision 'the form that trial on these issues would take.'"  *Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 16983, at *5 (N.D. Ill. Jan. 31, 1990) (quoting *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981)). *See also Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430, 437 (N.D. Ill. 2003) (quoting *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 530 (N.D. Ill. 1998)) (in evaluating a request for class certification, a court "cannot consider the merits of [the plaintiffs'] claim and [is permitted to] consider the evidence presented by both parties only to the extent needed to 'understand the claims, defenses, relevant facts and applicable substantive law.'"); *Elliott v. ITT Corp.*, 150 F.R.D. 569, 572 (N.D. Ill. 1992) (on a motion for class certification, a court may not consider arguments on the merits of the case, but it looks to the substantive elements of the class claims and the evidence necessary to prove those elements so as to envision the form which trial on those issues

will take).

### 2.    Rule 23(a) Requirements

The Court finds little difficulty in concluding that the requirements of Rule 23(a) are met in this case.  Turning first to the issue of numerosity, in view of the fact that the proposed class includes owners and lessees of GMC vehicles in forty-seven states and involves thirty-one different models of GMC vehicles manufactured over a period of ten years, it is reasonable to assume that the proposed class includes hundreds of thousands, if not millions, of persons.  *See Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 662 (N.D. Ill. 1996) (noting that a court is entitled to make "common sense assumptions" in resolving the question of numerosity).  Given the size of the proposed class, it is clear that the requirement of numerosity is met.  *See Thillens, Inc. v. Community Currency Exch. Ass'n of Ill., Inc.*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("Where the class is large, the numbers alone are dispositive of the impracticability of joinder."); *Hochschuler v. G.D. Searle & Co.*, 82 F.R.D. 339, 343 (N.D. Ill. 1978) (noting that a class exceeding one thousand members is plainly sufficient to satisfy numerosity).  Although GMC suggests that the proposed class is not drawn with sufficient precision, the Court disagrees.  A class must be adequately defined and clearly ascertainable before a class action may proceed.  *See Harris v. General Dev. Corp.*, 127 F.R.D. 655, 658 (N.D. Ill. 1989).  A sufficiently definite class exists "if its members can be ascertained by reference to objective criteria," *Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394, 397 (N.D. Ill. 1987), so that it is "administratively feasible for the Court to determine whether a particular individual is a member of the proposed class."  *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999).  Plaintiffs' proposed class of owners and lessees of specific GMC product lines during specific model years easily meets this test.  Thus, the requirement of numerosity

is satisfied.

As to commonality, this requirement is met if the claims of a proposed class arise from "[a] common nucleus of operative fact," *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), such that the case presents "at least one question of law or fact common to the class." *Arenson*, 164 F.R.D. at 663. The Court does not share the view expressed by some authorities that a request for so-called "issue certification" pursuant to Rule 23(c)(4)(A) automatically satisfies the requirement of commonality simply because it is, by definition, a request for class certification solely as to a particular question of fact or law. *See, e.g., In re Tetracycline Cases*, 107 F.R.D. 719, 729 (W.D. Mo. 1985); W. Russell Taber, *The Reexamination Clause: Exploring Bifurcation in Mass Tort Litigation*, 73 Def. Couns. J. 63, 64 n.6 (2006). To satisfy commonality, it is not sufficient merely to identify a question of law or fact; the question must be common to the class. Nevertheless, in this instance Plaintiffs have identified three questions of law and fact common to the class, e.g., whether the statements made by GMC about Dex-Cool in the owner's manuals that accompanied certain GMC vehicles constitute an express warranty, whether Dex-Cool is compatible with the intake manifold gaskets in certain GMC vehicles, and whether Dex-Cool is compatible with the cooling system in certain such vehicles. Of course, it is important to remember that commonality is "a . . . low hurdle . . . [that is] easily surmounted" because only a single common question of law or fact is necessary to meet the requirement. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). *See also Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 616 (W.D. Wis. 2003) (calling commonality "a permissive standard" because "a single common issue is sufficient to satisfy this requirement."). Whether a question common to the class predominates over merely individual issues so as to warrant class certification under Rule 23(b)(3) is a very different matter, as will be discussed

in the next section of this Order.

Concerning typicality, the claims of a named class representative are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario*, 963 F.2d at 1018 (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). *See also Clay*, 188 F.R.D. at 491 ("The Court should concentrate on the defendants' alleged conduct and the plaintiffs' legal theory to satisfy [typicality]."). "Typical does not mean identical, and the typicality requirement is liberally construed . . . . Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Westefer*, 2006 WL 2639972, at *5. In this instance Plaintiffs' claims are premised on the same conduct and the same legal theory as the rest of the proposed class because all such claims posit that the alleged incompatibility of Dex-Cool with the intake manifold gaskets and cooling systems in certain GMC vehicles constitutes a breach of the warranties made by GMC in the owner's manuals that accompanied those vehicles. Therefore, "the named plaintiff[s'] interests are aligned with the proposed class, and thus in pursuing their own claims, the named plaintiffs will also advance the interest of the class." *Guillory v. American Tobacco Co.*, No. 97 C 8641, 2001 WL 290603, at *4 (N.D. Ill. Mar. 20, 2001). *See also Spencer v. Central States, S.E. & S.W. Areas Pension Fund*, 778 F. Supp. 985, 989 (N.D. Ill. 1991) (explaining that "[t]ypicality . . . is intended as a safeguard to insure that the named plaintiff[s'] interests are substantially coextensive with the interests of the class."). The requirement of typicality is satisfied in this case.

Finally, with respect to the last requirement of Rule 23(a), adequacy, a plaintiff is adequate

and thus qualified to represent a class "if his 'interest in proving his claim[s] will lead him to prove the claims of the remainder of his class.'" *Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 121 F.R.D. 664, 670 (N.D. Ill. 1988) (quoting *Hochschuler*, 82 F.R.D. at 348). To meet the requirement of adequacy, a class representative must not have "antagonistic or conflicting claims" with the members of the purported class. *Gammon v. GC Servs. Ltd. P'ship*, 162 F.R.D. 313, 317 (N.D. Ill. 1995). *See also Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas)*, 94 F.R.D. 147, 154 (N.D. Ill. 1982) (adequacy is satisfied "[a]s long as the Court is . . . assured that the named parties are qualified and capable of fully pursuing the common goals of the class without collusion or conflicts of interest."). "Absent any conflict between the interests of the representative and [other class members], and absent any indication that the representative will not aggressively conduct the litigation, fair and adequate protection of the class may be assumed." *Guarantee Ins. Agency Co. v. Mid-Continental Realty Corp.*, 57 F.R.D. 555, 565-66 (N.D. Ill. 1972). In this case GMC has not produced any evidence of inconsistencies between the interests of Plaintiffs and the members of the proposed class such as to establish the inadequacy of Plaintiffs as class representatives. Thus, the Court concludes that all of the requirements of Rule 23(a) are satisfied in this case.[4]

---

4.      The requirement of adequacy under Rule 23(a) frequently is set out as a two-part inquiry: (1) whether the named plaintiff's representation in protecting the distinct interests of class members is adequate and (2) whether the named plaintiff's counsel is adequate. *See, e.g., Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993); *Wallace v. Chicago Hous. Auth.*, 224 F.R.D. 420, 429 (N.D. Ill. 2004). However, in view of amendments to Rule 23 of the Federal Rules of Civil Procedure in 2003, it is clear that the inquiry into the adequacy of counsel is governed not by Rule 23(a) but by Rule 23(g). The commentary to Rule 23 explains that, in light of the 2003 amendments, "Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while [Rule 23(g)] will guide the court in assessing proposed class counsel as part of the certification decision." Fed. R. Civ. P. 23 advisory committee's note. *See also Westefer*, 2006 WL 2639972, at *6 n.2, *11. Because as will be discussed infra this case does satisfy the

### 3.     Rule 23(b)(3) Requirements

As discussed, even if the requirements of Rule 23(a) are satisfied, a party seeking class certification must show that certification is appropriate under at least one of the subsections of Rule 23(b).  In this instance Plaintiffs seek certification under Rule 23(b)(3), which permits a case to proceed as a class action when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  "This rule requires two findings:  predominance of common questions over individual ones and superiority of the class action mechanism." *Murry v. America's Mortgage Banc, Inc.*, No. 03 C 5811, 03 C 6186, 2005 WL 1323364, at *9 (N.D. Ill. May 5, 2005). In evaluating the requirement of superiority, a court must consider:  "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3).  *See also Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

The Court notes that in recent years some sister courts have held that in cases where class certification of issues is sought pursuant to Rule 23(c)(4)(A), the requirement of predominance is to be evaluated in a different, less demanding manner than in cases where claims are sought to be

---

requirements for class certification under Rule 23(b)(3) the Court does not reach the issue of adequacy of proposed class counsel.

certified for class treatment.  *See, e.g., Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); *Campion v. Credit Bureau Servs., Inc.*, 206 F.R.D. 663, 676 (E.D. Wash. 2001) (conducting the predominance analysis on an issue-by-issue basis rather than on the basis of the case as a whole and concluding that class certification was appropriate pursuant to Rule 23(b)(3) even though the issues as to which certification was sought did not predominate over individual issues in the case); *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 657 (C.D. Cal. 2000) (same); *In re Tetracycline Cases*, 107 F.R.D. at 727 ("[T]he appropriate meaning of Rule 23(b)'s predominance requirement, as applied in the context of a partial class certification request under Rule 23(c)(4)(A), is simply that the issues covered by the request be such that their resolution (as a class matter) will materially advance a disposition of the litigation as a whole.").  Commentators have suggested that the relaxed view of predominance espoused in some decisions regarding issue certification under Rule 23(c)(4)(A) reflects a desire on the part of federal courts to uncover new procedural devices for managing a rising tide of mass tort litigation over the past decade and a half, *see* Laura J. Hines, *The Dangerous Allure of the Issue Class Action*, 79 Ind. L.J. 567, 569-72 (2004), and this theory finds some support in the language of the case law.  *See, e.g., Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167-68 (2d Cir. 2001) (criticizing a district court for failing to appreciate the "potential benefits" of issue certification under Rule 23(c)(4)(A), of which it urged district courts to "take full advantage.").  The Court, which has its own crowded docket to contend with, is sympathetic to these concerns, but concludes that an expansive approach

to class certification under Rule 23(c)(4)(A) is supported neither by the text of Rule 23 nor the binding precedent of this Circuit.

Of particular importance here is *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995). In *Rhone-Poulenc Rorer* a trial court granted class certification pursuant to Rule 23(c)(4)(A) as to the issue of liability on behalf of a nationwide class of hemophiliacs in an action against manufacturers of blood solids, whom, the plaintiffs alleged, had negligently distributed products contaminated with the AIDS virus, with the result that many hemophiliacs were infected with HIV. *See id.* at 1295-97. The Seventh Circuit Court of Appeals remarked on "the district judge's commendable desire to experiment with an innovative procedure for streamlining the adjudication of this 'mass tort,'" *id.* at 1297, but proceeded to grant an extraordinary writ of mandamus to decertify the class, holding that the class certification ruling ignored the difficulties inherent in applying the common law of negligence of multiple states to a nationwide class:

> The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may as the plaintiffs have argued forcefully to us differ among the states only in nuance . . . . But nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts. "The common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified." The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch.

*Id.* at 1300-01 (quoting *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting)) (citations omitted).[5] As *Rhone-Poulenc Rorer* makes clear, Rule 23(c)(4)(A) does not create, in addition to the three types of class actions enumerated in Rule 23(b), a fourth type, the

---

5.     The *Rhone-Poulenc Rorer* decision antedates, of course, the amendment of Rule 23 in 1998 to authorize discretionary appeals from decisions regarding class certification. *See* Fed. R. Civ. P. 23(f).

"issue" class action. Rather, where class certification is sought as to issues under Rule 23(c)(4)(A), Rule 23(b)(3)'s requirements of predominance and manageability must be satisfied, and class certification must be denied where those requirements cannot be met by reason of, for example, the difficulties involved in attempting to apply the laws of numerous states to the questions as to which class certification is sought. "A district court cannot manufacture predominance through the nimble use of subdivision (c)(4) [of Rule 23]." *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996). As it turns out, *Rhone-Poulenc Rorer* is especially prophetic with respect to this case. The Court, as discussed, has found that this case presents some common questions for purposes of Rule 23(a)'s commonality requirement. However, determining whether GMC in fact has made enforceable express warranties to the class, as Plaintiffs claim, will require the Court to apply the significantly-differing laws of forty-seven states, a prospect that defeats both the predominance and manageability requirements of Rule 23(b)(3). Also defeating predominance and manageability under Rule 23(b)(3) is the fact that, in order to determine whether factory-installed Dex-Cool actually has caused any damage to GMC vehicles owned or leased by the proposed class, the Court will be required to adjudicate claims relating to no fewer than thirty-one different models of GMC vehicles manufactured over some ten years. The Court will discuss each of these obstacles to class certification in turn.

<strong>a.    Conflict of Laws</strong>

Although Plaintiffs bring this action pursuant not to state law but the Magnuson-Moss Act, state law nonetheless dominates this case due to the peculiar nature of the federal statute, which in numerous respects is essentially a vehicle for vindicating state-law warranty claims in federal court. The Magnuson-Moss Act allows a consumer "who is damaged by the failure of a supplier,

Page 18 of  43

warrantor, or service contractor, to comply with any obligation under . . . a written warranty . . . [to] bring suit for damages and other legal and equitable relief."   15 U.S.C. § 2310(d)(1). "Magnuson-Moss is strictly a warranty statute based in contract law.  When Congress passed the Act, it incorporated [Uniform Commercial Code ("UCC")]-based State warranty law and not State tort law."  *Walsh v. Ford Motor Co.*, 588 F. Supp. 1513, 1527 (D.D.C. 1984) (citing H.R. Rep. No. 93-1107 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7702).  *See also Sharpe v. General Motors Corp.*, 401 S.E.2d 328, 330-31 (Ga. Ct. App. 1991) (the Magnuson-Moss Act "relates to *damages*, not liability, and provides for consumers' recovery of costs and attorney's fees in successful actions for breaches of warranty *under state law*.") (emphasis in original).  Simply put, "state warranty law lies at the base of all warranty claims under Magnuson-Moss."  *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C. Cir. 1986).[6]

Because the claims in this case are governed by state law, the next question, of course, is which state's law governs the claims of the members of the proposed class.  The Court concludes that this conflict of laws analysis is controlled by the law of Illinois.  Under the familiar doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the presumption is that a federal court will apply state law in all instances save when a countervailing federal interest mandates the application of federal law.  *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 464 (1967); *Wainwright Bank v. Railroadmens Fed. Savs. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149-50 (7th Cir. 1986);

---

6.    The Magnuson-Moss Act does contain substantive provisions in addition to the remedies it furnishes for prosecuting state-law breach of warranty claims in federal court.  For example, the statute provides for minimum content standards for limited warranties, and limits the content of written disclaimers of warranties.  *See* 15 U.S.C. § 2304, § 2308.  Plaintiffs, however, do not allege any violation of the substantive provisions of the statute, only breaches of alleged express warranties, so that the claims in this case are controlled by state law.

*Morgan v. South Bend Cmty. Sch. Corp.*, 797 F.2d 471, 475-76 (7th Cir. 1986); *Isaacs v. Caterpillar, Inc.*, 702 F. Supp. 711, 713 (C.D. Ill. 1988); 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4520 (3d ed. 1998. & Supp. 2006) (collecting cases).  Consistent with the *Erie* presumption in favor of state law, the Court will apply the conflict of laws rules of Illinois, the state where the Court sits.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (state conflict of laws rules constitute substantive law for *Erie* purposes, so that a federal court in applying state substantive law must apply the law where the court sits); *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 634 (7th Cir. 2002) (same); *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) (same).

The Illinois UCC, which applies, of course, to transactions for the sale of goods and, where applicable, displaces the common law of contract, *see* 810 ILCS 5/2-102; 810 ILCS 5/1-103, contains a specific statutory provision governing conflict of laws issues in warranty cases.  That provision states, in relevant part, "[e]xcept as provided in this Section, when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of the other state or nation shall govern their rights and duties.  Failing an agreement, this Act applies to transactions bearing an appropriate relation to this State."  810 ILCS 5/1-105(1).  Although the statute does not define what constitutes an "appropriate" relationship to the state of Illinois, it is reasonable to assume that a transaction occurring wholly outside Illinois would not have such a relationship, as a matter of elementary principles of constitutional due process.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)) ("[F]or a State's substantive law to be selected in a constitutionally permissible manner," as against the laws of other states, "that State

must have a significant contact or significant aggregation of contacts, creating state interests, such

that choice of its law is neither arbitrary nor fundamentally unfair."); *In re Brand Name Prescription*

*Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) (stating that, under federal constitutional

limits, "[a] state cannot regulate sales that take place wholly outside it.").  Considering, then, the law

applicable to those transactions which do not have a constitutionally-appropriate relationship to

Illinois, although 810 ILCS 5/1-105 has not been the subject of extensive judicial construction,

case law both from Illinois and from other state jurisdictions that have adopted the UCC suggests

that the claims of the proposed class must be governed by the laws of the states where the members

of the class reside.

   In evaluating whether a transaction has an "appropriate" relationship to a state so as to justify

application of that state's warranty law to the transaction, courts generally look to the place where

goods were sold or used and where injury occurred.  *See, e.g., Gates Rubber Co. v. USM Corp.*, 351

F. Supp. 329, 333-34 (S.D. Ill. 1972) (the Illinois UCC governed the question of the legal effect of

a limitation of liability clause in a contract for sale of a lead extrusion press in an action alleging

negligent design, manufacture, and installation of the press, where the press was delivered, installed,

and operated by the buyer for several years in Illinois, and Illinois was the state where injury

occurred when the base platen of the press cracked).  *See also Westerman v. Sears, Roebuck & Co.*,

577 F.2d 873, 879 (5th Cir. 1978) (holding that Florida law governed claims for breach of express

and implied warranties in connection with an automobile accident caused by an allegedly defective

tire where the buyers of the tire resided in Florida, and sale, service, and the vast majority of use of

the tire occurred in Florida); *Bilancia v. General Motors Corp.*, 538 F.2d 621, 623 & n.3 (4th Cir.

1976) (in a suit for breach of warranty arising from an automobile accident that allegedly was the

result of a product defect, holding that the state where the accident occurred had the most appropriate relationship to the transaction); *Aldon Indus., Inc. v. Don Myers & Assocs., Inc*., 517 F.2d 188, 190 (5th Cir. 1975) (where both a carpet manufacturer and its dealer knew that carpet sold to the dealer was to be installed in Florida, and where alleged injury to the dealer because of lost sales due to defects in the carpeting occurred solely in Florida, the law of Florida governed the dealer's claims against the manufacturer for breach of warranty and negligence in the manufacture of the carpeting); *Whitaker v. Harvell-Kilgore Corp*., 418 F.2d 1010, 1016 (5th Cir. 1969) (Georgia law controlled warranty claims arising from an incident in which a serviceman was injured by an allegedly defective hand grenade during basic training where the plaintiff was a Georgia citizen injured in Georgia and the manufacturers of the grenade were alleged to do business in Georgia); *P & E Elec., Inc. v. Utility Supply of Am., Inc.*, 655 F. Supp. 89, 94 (M.D. Tenn. 1986) (Louisiana law governed a buyer's action for breach of warranty and breach of contract where the goods were delivered in Louisiana); *Owens-Corning Fiberglas v. Sonic Dev. Corp.*, 546 F. Supp. 533, 540 (D. Kan. 1982) (in an action for breach of warranty against the manufacturer of three air compressors, Kansas law applied where the manufacturer shipped the air compressors into Kansas, the air compressors were used in Kansas, and, if any warranties existed, they were breached in Kansas).  In this case, of course, the goods at issue, GMC vehicles, were delivered and used in the states where the members of the proposed class reside, and it is in those states that their alleged injuries occurred.  Accordingly, it is those states that have the most appropriate relationship to the transactions at issue for conflict of laws purposes under the Illinois UCC.

The Court notes that the result would be the same if the conflict of laws analysis were conducted under the familiar "most significant contacts" standard set out in the

*Restatement (Second) of Conflict of Laws* (1971), which Illinois applies to all conflict of laws disputes involving contracts. *See Palmer v. Beverly Enters.*, 823 F.2d 1105, 1108-09 (7th Cir. 1987); *Fischer Indus. Inc. v. Medivance Instruments, Ltd.*, No. 89 C 9082, 1992 WL 686866, at *15 (N.D. Ill. Aug. 31, 1992); *Champagnie v. W.E. O'Neil Constr. Co.*, 395 N.E.2d 990, 996-97 (Ill. App. Ct. 1979).[7]  In fact, the majority of courts treat the most significant relationship standard as being functionally identical to the "appropriate relation" standard set out in the UCC. *See, e.g., P & E Elec.*, 655 F. Supp. at 94; *Tucker v. Capitol Mach., Inc.*, 307 F. Supp. 291, 294 (M.D. Pa. 1969); *General Elec. Credit Corp. v. R.A. Heintz Constr. Co.*, 302 F. Supp. 958, 961-62 (D. Or. 1969); *Martin v. Julius Dierck Equip. Co.*, 384 N.Y.S.2d 479, 483 (N.Y. App. Div. 1976); *Collins Radio Co. of Dallas, Tex. v. Bell*, 623 P.2d 1039, 1046-47 (Okla. Ct. App. 1980); *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 & n.17 (Pa. 1964); *Baffin Land Corp. v. Monticello Motor Inn, Inc.*, 425 P.2d 623, 627 (Wash. 1967); *Wilcox v. Wilcox*, 133 N.W.2d 408, 415 (Wis. 1965).

According to the *Restatement*, in determining the law to be applied in a contract action in which the parties have not selected the applicable law, a court must consider the following factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. *See* Restatement (Second) of Conflict of Laws § 188. *See also Palmer*, 823 F.2d at 1109-10; *Wonderlic Agency, Inc. v. Acceleration Corp.*, 624 F. Supp. 801, 804 (N.D. Ill. 1985); *Illinois Tool Works v. Sierracin Corp.*, 479 N.E.2d 1046, 1050-

---

7.     The *Restatement* also is the source of the federal common law of conflict of laws. *See Lambert v. B.P. Prods. N. Am., Inc.*, Civil No. 04-347-GPM, 2006 WL 924988, at *2 n.1 (S.D. Ill. Apr. 6, 2006) (citing *Morewitz v. West of England Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1363 n.13 (11th Cir. 1995)).

51 (Ill. App. Ct. 1985).  The weight of authority holds that, in cases involving alleged breach of warranty, the state where goods were delivered and where injury occurred has the most significant relationship for conflict of laws purposes.  *See, e.g., Wayne v. Tennessee Valley Auth.*, 730 F.2d 392, 399-400 (5th Cir. 1984) (in a suit alleging breach of implied warranty, negligence, and strict liability against a producer of toxic phosphate slag incorporated into concrete blocks used in construction of the plaintiffs' home, holding that Tennessee, where the blocks were purchased and used, had the most significant relationship to the controversy so as to mandate application of Tennessee law); *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 12-13 (D.D.C. 1995) (even if there were a genuine conflict between the warranty law of the District of Columbia and of Maryland, the court would apply District of Columbia law, where an allegedly defective product was sold and delivered in the District, and express and implied warranties were made to a buyer in the District); *Jackson v. National Semi-Conductor Data Checker/DTS, Inc.*, 660 F. Supp. 65, 70-71 (S.D. Miss. 1986) (Alabama, as the state where an allegedly defective cash register was sold, used, and caused injury, had the most significant relationship to a claim for breach of implied warranty); *Armstrong Cork Co. v. Drott Mfg. Co.*, 433 F. Supp. 413, 417-19 (E.D. Pa. 1977) (where goods were purchased in Georgia, used in Georgia, and damage to the goods occurred in Georgia, the law of Georgia governed the plaintiff's claim for breach of implied warranty); *Quadrini v. Sikorsky Aircraft Div., United Aircraft Corp.*, 425 F. Supp. 81, 89-90 (D. Conn. 1977) (the law of the place where allegedly defective goods were delivered governed breach of warranty claims); *Martin*, 384 N.Y.S.2d at 482-83 (the law of the place where allegedly defective goods were used and injury occurred governed breach of warranty claims).  Accordingly, in this case it is the states where the members of the proposed class reside, which is where, presumably, the goods at issue were delivered

and the injuries alleged by class members occurred, that have the most significant relationship to the

class claims.

Having determined that the claims of the proposed class for breach of express warranties are

governed by the laws of the forty-seven states where the class members reside, the Court turns to

the issue of the content of that state law.  As discussed, the Magnuson-Moss Act provides a vehicle

for the vindication of state warranty law under the UCC.  Concerning the creation of express

warranties, the Official Text of the UCC provides:

> (2) Express warranties by the seller to the immediate buyer are created as follows:
> (a) Any affirmation of fact or promise made by the seller which relates to the goods
> and becomes part of the basis of the bargain creates an express warranty that the
> goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain
> creates an express warranty that the goods shall conform to the description.
>
> * * * *
>
> (3) It is not necessary to the creation of an express warranty that the seller use formal
> words such as "warrant" or "guarantee" or that the seller have a specific intention to
> make a warranty, but an affirmation merely of the value of the goods or a statement
> purporting to be merely the seller's opinion or commendation of the goods does not
> create a warranty.

U.C.C. Sales § 2-313.  The commentary to section 2-313 states, "'Express' warranties rest on

'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that

words of disclaimer in a form are repugnant to the basic dickered terms."  *Id*. cmt. 3.  The

commentary explains further,

> The present section deals with affirmations of fact or promises made by the seller,
> descriptions of the goods, or exhibitions of samples or models, exactly as it deals
> with any other part of a negotiation which ends in a contract.  No specific intention
> to make a warranty is necessary if any of these factors is made part of the basis of the
> bargain.  In actual practice affirmations of fact and promises made by the seller
> about the goods during a bargain are regarded as part of the description of those
> goods; hence no particular reliance on these statements need be shown in order to

weave them into the fabric of the agreement.  Rather, any fact which is to take these affirmations or promises, once made, out of the agreement requires clear affirmative proof.

* * * *

Concerning affirmations of value or a seller's opinion or commendation under subsection (3), the basic question remains the same:  What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain?  As indicated above, all of the statements of the seller do so unless good reason is shown to the contrary.

*Id*. cmt. 5, 10.

As Plaintiffs point out, both the Official Text of section 2-313 and the commentary thereto indicate that the drafters of the UCC intended for all of a seller's affirmations of fact or promises relating to goods to become part of the basis of the bargain, thus creating an express warranty, without a demonstration of a buyer's specific reliance on those affirmations and promises.  The problem from Plaintiffs' point of view, of course, is that the UCC, like the common law, is not a brooding omnipresence in the sky, but the articulate voice of a sovereign.  That is to say, as enacted by the several states and as judicially interpreted by the courts of those states, the UCC is subject to important variations from state to state.  Quite simply, "'[t]he Uniform Commercial Code is not uniform.'"  *Walsh*, 807 F.2d at 1016 (quoting J. White & R. Summers, *Uniform Commercial Code* § 7 (2d ed. 1980)).  This brings the Court, then, to the matter of how the various states in the proposed class approach the issue of a buyer's reliance on a seller's affirmations of fact or promises relating to goods as an element of a claim for breach of an express warranty.  Regrettably, Plaintiffs' counsel have not made much effort in their briefing on class certification to address variations in state law concerning reliance as an element of an express warranty claim.  The Court has researched the matter in some detail, though not exhaustively; as discussed, it is Plaintiffs' burden as the

proponents of class certification to demonstrate the predominance of common questions and the manageability of the classwide claims at trial, and to show convincingly that variations in state law do not defeat predominance and manageability.  The Court's research suggests that the states in the proposed class employ at least three distinct approaches to the question of reliance as an element of a claim for breach of an express warranty.

It appears that a large number of states in the proposed class, possibly a majority, hold that reliance is not an element of an express warranty claim.  *See, e.g., Community Television Servs., Inc. v. Dresser Indus., Inc.*, 586 F.2d 637, 640 (8th Cir. 1978) (applying South Dakota law) (statements in an advertising catalog had to be considered part of the entire agreement of the parties even in the absence of a showing that a buyer relied on the catalog); *Lennar Homes, Inc. v. Masonite Corp.*, 32 F. Supp. 2d 396, 399 (E.D. La. 1998) (holding that beneficiaries of an express warranty need not prove reliance to sustain a claim for breach of warranty under the Florida UCC); *Pegasus Mgmt. Co. v. Lyssa, Inc.*, 995 F. Supp. 43, 44-45 (D. Mass. 1998) (predicting that the Supreme Court of Connecticut would rule that purchasers do not have to demonstrate reliance on express warranties in order to recover on claims for breach of "bargained for" express warranties, and declining to certify the question to that court); *Unified School Dist. No. 500 v. U.S. Gypsum Co.*, 788 F. Supp. 1173, 1177 (D. Kan. 1992) (reliance is not an element of an action for breach of express warranty under the Kansas UCC); *Rock Creek Ginger Ale Co. v. Thermice Corp.*, 352 F. Supp. 522, 526-27 (D.D.C. 1971) (a representation made by a reputable brewer of beer to a distributor of carbon dioxide that the surplus carbon dioxide the brewer was willing to sell to the distributor was from time to time used by the brewer in the manufacture of its own beer was a representation on which the distributor was entitled to rely as a matter of fact, regardless of reliance); *Winston Indus., Inc.*

*v. Stuyvesant Ins. Co.*, 317 So. 2d 493, 496-97 (Ala. Civ. App. 1975) (where the bill of sale for a mobile home stated that "[n]ew trailers bear usual factory guarantee," the manufacturer's express warranty was the basis of the bargain, and, thus, the mobile home purchaser's insurer, who was subrogated to the purchaser, was not barred from recovering for breach of such warranty, even though the purchaser failed to receive a copy of the warranty and was assertedly unaware of the warranty); *Torres v. Northwest Eng'g Co.*, 949 P.2d 1004, 1013 (Haw. Ct. App. 1997) ("[R]eliance is not an essential element of a breach of express warranty claim under the UCC."); *CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997, 1002 (N.Y. 1990) (a seller of consumer magazine businesses was not absolved from its warranty obligations as to the magazines' profitability, even though a buyer and its accountants, prior to closing, questioned the accuracy of financial information, and the buyer closed without believing in or relying on the truth of the information); *Norcold, Inc. v. Gateway Supply Co.*, 798 N.E.2d 618, 623-24 (Ohio Ct. App. 2003) (claims for breach of express warranty against a manufacturer and distributor of refrigerator parts were not barred by the fact that a plaintiff allegedly did not rely on the warranties at issue: "[R]eliance is not an element in a claim for breach of an express written warranty."); *Daughtrey v. Ashe*, 413 S.E.2d 336, 338-39 (Va. 1992) (a buyer's reliance on express warranties by a seller relating to goods was not a necessary element of the buyer's breach of express warranty claim). Obviously, reliance is not an issue with respect to the claims of class members residing in states that have dispensed with the requirement that a buyer rely on a seller's statements in order for the statement to be part of the basis of the bargain, thus creating an express warranty.

However, it appears also that a significant number of other states in the proposed class require specific reliance on a seller's statements as a condition of recovery under section 2-313 of

the UCC.  *See, e.g., Speed Fastners, Inc. v. Newsom*, 382 F.2d 395, 397 (10th Cir. 1967) (applying Oklahoma law) (in an action by a carpenter foreman who was injured by an allegedly defective power-loaded gun, holding that the plaintiff could not maintain an action for breach of warranty against the manufacturer of the gun where it did not appear that the plaintiff's employer relied on any statement in an advertising pamphlet issued by the manufacturer in purchasing the gun); *Hagenbuch v. Snap-On Tools Corp.*, 339 F. Supp. 676, 680 (D.N.H. 1972) (in order to establish an express warranty, a buyer has the burden of showing that he acted on the basis of the representations of fact; thus, where a buyer of a hammer who sustained an eye injury when the hammer chipped produced no evidence that he relied on a catalog description stating that federal specifications applied to the hammer, the buyer could not recover for breach of express warranty); *Flory v. Silvercrest Indus., Inc.*, 633 P.2d 383, 390 (Ariz. 1981) (a written warranty made by the manufacturer of a mobile home to the purchasers of the mobile home did not become part of the basis of the bargain for purposes of a claim of breach of express warranty under the UCC because the manufacturer's written warranty was not given to the buyers until some time after sale and delivery of the mobile home); *Hillcrest Country Club v. N.D. Judds Co.*, 461 N.W.2d 55, 61 (Neb. 1990) ("[S]ince an express warranty must have been 'made part of the basis of the bargain,' it is essential that the plaintiffs prove reliance upon the warranty."); *Masters v. Rishton*, 863 S.W.2d 702, 706 (Tenn. Ct. App. 1992) (breach of express warranty was not available to a plaintiff who had never seen any advertisements for or heard any representations about the safety of a product).  The law in these states raises squarely the problem of proving reliance on an individualized basis, an issue not susceptible of classwide resolution.  *See, e.g., Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 197-99 (D. Mass. 1999) (denying class certification as to claims for breach of

express warranties where the claims raised issues of reliance on a seller's representations that required individualized determinations).

Finally, it appears that a small minority of the states in the class, including Illinois, follow a third approach to reliance, holding that a seller's affirmations and promises relating to goods create a rebuttable presumption of reliance by a buyer. *See, e.g., Sessa v. Riegle*, 427 F. Supp. 760, 766-67 (E.D. Pa. 1977) (even if a seller's statement to a buyer that a horse was "sound" was an express warranty, evidence that the buyer was relying primarily on his representative to advise him in connection with the sale and that the representative had talked with the buyer about the horse on several occasions and expressed the opinion that he was convinced "beyond the shadow of a doubt" that it was a good buy demonstrated that the seller's statement was not the basis of the bargain); *Felley v. Singleton*, 705 N.E.2d 930, 934 (Ill. App. Ct. 1999) (representations by a seller such as that a car is "in good mechanical condition" are presumed to be affirmations of fact that constitute express warranties, regardless of a buyer's reliance on such representations, unless the seller shows by clear affirmative proof that the representations did not become part of the basis of the bargain; *Weng v. Allison*, 678 N.E.2d 1254, 1256 (Ill. App. Ct. 1997) ("The burden is upon the seller to establish by clear, affirmative proof that . . . affirmations did not become part of the basis of the bargain."); *Connor v. Bogrett*, 596 P.2d 683, 685, 688 (Wyo. 1979) (holding that a buyer did not rely on a seller's affirmations and promises relating to a dog where it was shown that, before buying the dog, the buyer had the dog inspected by his own veterinarian). Of course, a presumption of reliance is just that, a presumption, capable of being rebutted upon an appropriate evidentiary showing. Once GMC presents evidence to rebut any presumption of reliance, as it has threatened to do by demonstrating that, for example, numerous class members never read the statements in the

Page 30 of  43

owner's manuals alleged to constitute a warranty, the presumption is destroyed, creating a myriad of issues of individual reliance. *See Mowbray*, 189 F.R.D. at 197-98 (declining to certify for class treatment claims of breach of express warranties under the Illinois UCC; under Illinois law, the UCC creates a presumption of reliance only, capable of rebuttal in individual cases, thus creating issues requiring resolution through individual actions).

As noted, Plaintiffs' briefing on class certification largely ignores the significant variations in the law governing express warranties among the forty-seven states in the proposed class. However, Plaintiffs do offer two proposals for handling the issue of reliance: employing a classwide presumption of reliance; and granting class certification as to the issue of whether GMC's representations concerning Dex-Cool in the owner's manuals accompanying certain GMC vehicles constitute an express warranty, while reserving issues of reliance on those representations for individualized determinations. The Court finds no merit in either proposal. Turning first to the matter of a classwide presumption of reliance, it is the case that, as the Court already has discussed, some states in the proposed class interpret the UCC as creating a rebuttable presumption of a buyer's reliance on a seller's affirmations of fact or promises relating to goods. However, this is not the approach taken by those states that require proof of actual reliance in order to maintain a claim for breach of express warranty under the UCC. The Seventh Circuit Court of Appeals specifically has warned that district courts, in making decisions about class certification, must avoid doing "violence not only to Rule 23 but also to principles of federalism." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002). In the *Bridgestone/Firestone* case a district court held that the claims of a proposed nationwide class of owners and lessees of Ford Explorer sport utility vehicles equipped with Firestone tires that allegedly were unusually susceptible to failure could be

maintained as a class action because the claims of the class were governed solely by the law of the states where the defendant auto manufacturer and tire manufacturer were headquartered. *See id.* at 1014-15.  On appeal, the grant of class certification was reversed.  The Seventh Circuit held that under the conflict of laws rules of the state where the district court sat, the court was required to apply the laws of the fifty states where the class members lived to the class claims. *See id.* at 1016-18.  The court acknowledged that the conflict of laws rule crafted by the district court might "be good on many dimensions." *Id.* at 1016.  However, the court went on to say, "Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court.  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected." *Id.* at 1020 (citations omitted).

Similarly, in *Rhone-Poulenc Rorer* the Seventh Circuit, in concluding that a district court abused its discretion in certifying a nationwide class, held that variations in relevant state law could not be overcome through the use of jury instructions that presented a generic or ideal law of negligence while ignoring local idiosyncrasies in such law, dismissing the proposed instructions as "Esperanto." 51 F.3d at 1300.  Significantly, the *Rhone-Poulenc Rorer* court invoked the rarely-noted constitutional basis for the *Erie* doctrine, namely, that such power as federal courts possess to interpret and apply state law is, at best, a negative power or, perhaps more properly, a badge of weakness, arising as it does from the fact that such courts lack constitutional authority to create a broad body of common law. *See id.  See also Kim Littlefield, DMD, P.C. v. Orthodontic Ctrs. of Ill., Inc.*, Civil No. 06-606-GPM, 2007 WL 273766, at *4 (S.D. Ill. Jan. 26, 2007); *Buller Trucking Co. v. Owner Operator Indep. Driver Risk Retention Group, Inc.*, 461 F. Supp. 2d 768, 775

(S.D. Ill. 2006).  While the Court does not go so far as to hold that the use of a classwide

presumption of reliance in this case exceeds the Court's constitutional power, *see ISI Int'l, Inc. v.*

*Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), both *Bridgestone/Firestone* and

*Rhone-Poulenc Rorer* make starkly clear that it is not this Court's prerogative to elide important

differences in the laws of the several states in order to speed the progress of a case to class

certification.[8]  Therefore, the Court rejects Plaintiffs' proposal concerning a classwide presumption

---

8.    The Court notes that the concerns expressed in *Bridgestone/Firestone* and *Rhone-Poulenc Rorer* apply especially cogently in this case where, no doubt, very solid policy arguments could be made for dispensing with reliance as an element of a claim for breach of express warranty under the UCC.  The persistence of reliance as an element of an express warranty claim may be a vestigial trace of the fact that such claims at one time sounded in tort.  *See Strika v. Netherlands Ministry of Traffic*, 185 F.2d 555, 558 (2d Cir. 1950).  *Cf.* Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.").  More likely it is a reflection of the fact that the Uniform Sales Act, the predecessor of the UCC, explicitly made reliance an element of a claim for breach of an express warranty, a requirement the UCC obviously intended to modify or perhaps erase.  *See generally* Sidney Kwestel, *Freedom From Reliance: A Contract Approach to Express Warranty*, 26 Suffolk U. L. Rev. 959, 961, 969-70 (1992); Robert S. Adler, *The Last Best Argument for Eliminating Reliance from Express Warranties: "Real-World" Consumers Don't Read Warranties*, 45 S.C. L. Rev. 429, 430-38 (1994).  Very distinguished jurists have criticized the use of reliance as an element of a claim for breach of express warranty; Justice Holmes, for example, saw no justification for failing to regard "[a]n assurance that it shall rain to-morrow" as an enforceable contract.  Oliver Wendell Holmes, *The Common Law* 234 (Little, Brown & Co. 1990) (1881).  *See also Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (Hand, J.) (a claim for relief in breach of warranty is complete upon proof of the warranty as part of a contract and proof of its breach:  "To argue that the promisee is responsible for failing independently to confirm [the warranty], is utterly to misconceive its office.").  More recently, the Supreme Court of the United States, with a nod to Grant Gilmore, spoke of "contract law . . . drown[ing] in a sea of tort," a concern that is implicated, arguably, by requiring warranty plaintiffs to show actual reliance on a seller's affirmations of fact or promises relating to goods.  *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986).  These interesting considerations to one side, the Court must apply the law not as litigants might wish it to be or, indeed, as it perhaps ought to be, but as it is.  *See Loucks v. Star City Glass Co.*, 551 F.2d 745, 746 (7th Cir. 1977) ("[I]t is not [the] province [of] a federal . . . court to fashion for [the states] what we are certain many would say was a wise and progressive social policy.").

of reliance, a presumption that in any event, as the Court already has discussed, is rebuttable and, once rebutted, gives rise to a host of individualized issues of reliance.

Turning then to Plaintiffs' proposal that the Court reserve issues of reliance for individualized determination after the Court decides whether the statements in GMC's owner's manuals constitute an express warranty, this idea simply makes no sense. As the Official Text of section 2-313 of the UCC explains, an express warranty consists of all of a seller's affirmations of fact and promises relating to goods that become part of the basis of the bargain. In jurisdictions that require actual reliance as an element of a claim for breach of an express warranty under the UCC, this means that only a seller's affirmations of fact and promises relating to goods that are actually relied upon become part of the basis of the bargain and thus an express warranty. *See Overstreet v. Norden Labs., Inc.*, 669 F.2d 1286, 1289-91 (6th Cir. 1982) (under Kentucky law, jury instructions on breach of express warranty were erroneous for failure to include a requirement that the buyer must have relied on the warranty: "A warranty is the basis of the bargain if it has been relied upon as one of the inducements for purchasing the product."); *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 422-23 (6th Cir. 1981) (applying Ohio law) (in order to determine whether precontract statements of a supplier were in fact a basis of the bargain and thus an express warranty, a court should consider the circumstances surrounding a transaction, the reasonableness of a buyer in believing the seller, and the reliance placed on the seller's statements by the buyer); *Jensen v. Seigel Mobile Homes Group*, 668 P.2d 65, 70-71 (Idaho 1983) (noting that, in jurisdictions that require reliance as an element of a warranty claim, "the buyer of goods [must] rely on an . . . affirmation of fact or promise . . . or . . . description . . . for the same to become . . . part of the basis of the bargain . . . and hence an express warranty.") (emphasis omitted); *Ewers v. Eisenzopf*, 276

Page 34 of 43

N.W.2d 802, 805 (Wis. 1979) ("The true test [of whether an express warranty has been created] is not whether the seller actually intended to be bound by his statement but rather whether he made an affirmation of fact [t]he natural tendency of which was to induce the sale and which did in fact induce it.").  The question of whether a seller's statement is a warranty is completely inseparable from the question of whether the statement was relied upon by a buyer.

Furthermore, even were it possible to separate the question of reliance from the question of whether the statements at issue in this case constitute a warranty – and the Court sees no way to know the dancer from that particular dance – the proposal raises very significant Seventh Amendment questions in the Court's mind.  The Seventh Amendment provides, of course, that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. In this case a jury trial has been demanded and therefore GMC is entitled to have all legal claims tried to the jury.  *See Curtis v. Loether*, 415 U.S. 189, 193-94 (1974) (the right of trial by jury provided in the Seventh Amendment extends beyond the common-law forms of action recognized at the time of the amendment's adoption and the amendment may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights; thus, the Seventh Amendment right to a jury trial applies to actions enforcing statutory rights and requires a jury on demand if a statute creates legal rights and remedies enforceable in an action for damages in ordinary courts of law); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959) ("In the Federal courts this . . . jury . . . right [created by the Seventh Amendment] cannot be dispensed with, except by the assent of the parties entitled to it; nor

can it be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action, or during its pendency."). Also, once the right to a jury trial attaches to a claim, it extends to all factual issues necessary to the resolution of that claim. *See Ross v. Bernhard*, 396 U.S. 531, 537-38 (1970); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962); *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 354 (7th Cir. 1987); *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir. 1986). *See also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 (5th Cir. 1998) (citing *Beacon Theatres*, 359 U.S. at 510-11).

Were the Court to attempt artificially to sever the question of reliance on GMC's alleged affirmations and promises relating to Dex-Cool from the question of whether the statements in GMC's owner's manuals constitute an enforceable written warranty, there is little doubt that this would violate GMC's Seventh Amendment right to a jury trial. The Court obviously would be required to examine facts and to make determinations about the rights of Plaintiffs vis-a-vis GMC that it is solely the province of a jury to make. *See Allison*, 151 F.3d at 424-25 (in a civil rights action based on alleged race discrimination, holding that Seventh Amendment concerns precluded partial class certification as to disparate impact claims, severed from pattern or practice claims for which monetary relief was sought and for which a jury trial had been demanded, given the significant overlap of factual issues common between the disparate impact claims and the pattern or practice claims, which the parties were entitled to have decided first by a jury). It is GMC's right to have a jury determine all factual issues necessary to establish Plaintiffs' breach of warranty claims before the Court can consider the merits of any claim for equitable relief in this case. The law of this Circuit holds that, in granting class certification of issues pursuant to Rule 23(c)(4)(A), "the district judge must carve at the joint" to avoid jeopardizing a defendant's Seventh Amendment

rights. *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d at 1302. In this case, arbitrarily hacking the issue of reliance away from the issue of whether a warranty exists plainly violates this proscription. Accordingly, the Court rejects Plaintiffs' proposal to decide on a classwide basis the existence of a warranty, while reserving issues of reliance for individualized determination.

In view of the significant variations with respect to the law of warranty among the states in the proposed class, the Court's path is clear. The Seventh Circuit Court of Appeals has warned repeatedly in recent years against the certification of unwieldy multistate classes, holding that the difficulties inherent in applying the laws of numerous states to the class claims defeat both predominance and manageability. *See, e.g., In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018-21 (decertifying a nationwide class action alleging, inter alia, claims for breach of express and implied warranties: "Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *Isaacs v. Sprint Corp.*, 261 F.3d 679, 681-82 (7th Cir. 2001) (class certification was inappropriate in a suit by owners of land adjacent to railroad rights-of-way against railroad companies and a long-distance telephone company that bought sub-easements from the railroads alleging that the rights-of-way belonged to the landowners; the suit involved "different conveyances by and to different parties made at different times over a period of more than a century . . . in 48 different states [and] the District of Columbia . . . which have different laws regarding the scope of easements," so that individualized issues of law and fact predominated over any common issues); *Szabo*, 249 F.3d at 674, 677-78 (on interlocutory appeal, vacating and remanding for further consideration a district court's decision to grant class certification: "A nationwide class in what is fundamentally a breach-of-warranty action, coupled with a claim of fraud, poses serious problems about choice of law, the manageability of the suit, and

thus the propriety of class certification."). *See also Castano*, 84 F.3d at 740-41 (a multistate class consisting of nicotine-dependent persons who purchased and smoked cigarettes manufactured by the defendant tobacco companies was decertified because the district court failed to consider how variations in state law would affect predominance and superiority); *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (characterizing the task of instructing a jury as "impossible" where state laws differ). *Cf. In re Mexico Money Transfer Litig.*, 267 F.3d 743, 746-47 (7th Cir. 2001) (noting that, although certification of litigation class actions under the consumer fraud statutes of numerous states generally is inappropriate, the same is not true in the context of settlement class actions where "no one need draw fine lines among state-law theories of relief."). The variations in state law presented by this case defeat predominance and manageability, and therefore Plaintiffs' request for class certification will be denied.

**b.      Variety of GMC Vehicles in the Proposed Class**

As a further obstacle to class certification, the Court concludes that predominance and manageability are defeated by the extremely large number of models of GMC vehicles involved in the proposed class. This alternate reason for denying class certification is straightforward. As discussed, the class as to which Plaintiffs ask the Court to declare that representations in GMC's owner's manuals constitute an enforceable written warranty includes current and former owners and lessees of thirty-one different GMC models with four different engine types (3.1-, 3.4-, 3.8-, or 4.3-liter V-6), over ten model years, that were factory-equipped with any product meeting the specifications for Dex-Cool. Also, Plaintiffs ask the Court to determine on behalf of the class whether products meeting the specifications for Dex-Cool are "incompatible" with the intake manifold gaskets factory-installed in twenty-four different GMC models with three different engine

types (3.1-, 3.4-, and 3.8-liter), over ten model years.  Finally, Plaintiffs ask the Court to determine for the class whether all products meeting the specifications for Dex-Cool are "incompatible" with the cooling systems in seven different GMC models with 4.3-liter engines, over six model years. Plaintiffs have failed to offer any workable plan for resolving these issues in a classwide trial, and the Court is certain that they cannot be so resolved.

Once again, the *Bridgestone/Firestone* decision is instructive.  In *Bridgestone/Firestone*, which, as discussed, was a class action on behalf of owners and lessees of Ford Explorer vehicles equipped with Firestone tires that allegedly were unusually susceptible to failure, the district court certified two nationwide classes.  The first class included "everyone who owns, owned, leases, or leased a Ford Explorer of model year 1991 through 2001 anytime before" a partial manufacturer's recall of the tires in 2000.  *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1015.  The second class included "all owners and lessees from 1990 until today of Firestone ATX, ATX II, Firehawk ATX, ATX 23 Degree, Widetrack Radial Baja, or Wilderness tire models, or any other Firestone tire 'substantially similar' to them."  *Id*.  In reversing the grant of class certification, the Seventh Circuit Court of Appeals noted that the class definitions encompassed "[m]ore than 60 million tires and 3 million vehicles," and concluded,

> [T]his litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; . . . they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.  Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any

discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

*Id*. at 1015, 1018-19.  With respect to the variations among the numerous brands of Firestone tires in the proposed class, the Court said,

> Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires . . . .  The six trade names listed in the class certification order comprise 67 master tire specifications: "Firehawk ATX" tires, for example, come in multiple diameters, widths, and tread designs; their safety features and failure modes differ accordingly.  Plaintiffs say that all 67 specifications had three particular shortcomings that led to excess failures.  But whether a particular feature is required for safe operation depends on other attributes of the tires, and as these other attributes varied across the 67 master specifications it would not be possible to make a once-and-for-all decision about whether all 60 million tires were defective, even if the law were uniform.  There are other differences too, but the ones we have mentioned preclude any finding "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

*Id*. at 1019 (quoting Fed. R. Civ. P. 23(b)(3)).  Obviously, the concerns expressed by the *Bridgestone/Firestone* court apply with equal force in this case.  As discussed, the proposed class includes nearly forty models of GMC vehicles with multiple engine types manufactured over ten model years, and encompasses potentially millions of individual cars.  As GMC points out, issues of individual owner maintenance of vehicles must be addressed; for example, if the injuries at issue in this case are, as GMC contends, simply the result of failure by the members of the proposed class to maintain proper levels of coolant in their vehicles, this would preclude a finding that Dex-Cool is a defective product.  Under these circumstances, the Court sees no possibility of being able to

make the requested classwide determinations about the efficacy of Dex-Cool.

Decisions from sister circuits also counsel against a grant of class certification in this instance.  For example, in *Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), a suit under the Magnuson-Moss Act on behalf of a proposed nationwide class of owners of Ford vehicles alleged to suffer from a transmission defect that caused the vehicles to slip out of "park" position and into "reverse," the court found a lack of predominance, given the varying transmissions, varying possible defects, and different model years of the automobiles involved in the proposed class:

> Factual disputes over the four engine systems consisting of twenty-three or more component configurations employed in at least seventeen different models of Ford automobiles over five model years threaten to overwhelm the Court.  Moreover, evidence of liability and causation will involve highly technical and complex mechanical and statistical studies which a lay jury will need to digest and comprehend.  And when the myriad of factual permutations are piled upon layers of legal standards and choice of law dilemmas, this litigation appears to take on epic proportions.  The Court is also wary that this litigation will degenerate into numerous trials within a trial resulting in confusion and possible injustice to the parties.

*Id*. at 277.  The court concluded that "the plaintiffs' proposed litigation embodies a trial court's nightmare of a litigation monster," and held that, "[g]iven the sheer magnitude of the task, . . . the difficulties in managing this case as a class action are inevitable and insurmountable."  *Id*.  *See also Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 312 (S.D.N.Y. 1999) (denying class certification as to breach of warranty claims involving allegedly defective personal computers:  "Plaintiffs here purchased 115 different models of IBM computers with six different Mwave chips placed on seven different Mwave cards.  If a class were certified, a detailed factual inquiry into the differences between these models would be required."); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455-56 (D.N.J. 1998) (common fact issues did not predominate for purposes of class certification of state-law claims against an automobile manufacturer arising out of sales of cars with allegedly defective anti-lock

braking systems where the laws of the fifty-two affected jurisdictions varied, the majority of proposed class members had not experienced any defects, and there were individualized issues of causation with respect to cars that had experienced problems); *Barbarin v. General Motors Corp.*, Civ. A. No. 84-0888 (TPJ.), 1993 WL 765821, at *3 (D.D.C. Sept. 22, 1993) (certification of a consumer class in a Magnuson-Moss suit involving the braking performance of 1980 GMC X-cars was denied for lack of predominant common questions of law or fact:  "Not only are all of the vagaries of the law of warranties of the several states to be found here, . . . but the issues of fact as to the cause of each incident of so-called 'premature rear wheel lock-up' are unique.") (emphasis omitted).

Although Plaintiffs argue that, if Dex-Cool is incompatible with the cooling systems or gaskets in any of the GMC models in the proposed class, the same automatically is true with respect to all of the models at issue, it is inconceivable that the Court could resolve the matters as to which class certification is sought without any inquiry into the specific designs of each of the thirty-one models of GMC vehicles in the proposed class.  The disingenuousness of Plaintiffs' position is betrayed by their own submissions to the Court, in which they acknowledge freely that the technical issues in this case will require extensive expert testimony and argue that Dex-Cool is a defective product based on, for example, the positioning of the radiator cap in certain GMC models.  *See* Doc. 85 at 8-9; Doc. 86 at 8-9.  It is readily apparent to the Court that there is no practicable way to adjudicate claims pertaining to all of the GMC models in the proposed class, and therefore class certification must be denied.[9]

---

9.     As a final matter, the Court notes that this case is not suitable for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure, as Plaintiffs in fact concede.  The constitutional rationale for dispensing with the requirements of notice and an opportunity to opt out

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification (Doc. 84) in this cause is **DENIED**.

**IT IS SO ORDERED.**

DATED:  02/16/07

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge

---

in Rule 23(b)(2) class actions is that, where class members seek relief that is primarily equitable rather than legal, e.g., money damages, the constitutional protections for the rights of unnamed class members furnished by notice and opt-out are not required. *See Westefer*, 2006 WL 2639972, at *7. In this case, although Plaintiffs are not requesting damages at this stage of the proceedings, it is obvious that the primary relief sought is monetary, not equitable, making Rule 23(b)(2) certification inappropriate. *See In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005); *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 763-64 (7th Cir. 2003); *Lemon v. International Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000); *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 897 (7th Cir. 1999). *See also Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975-76 (5th Cir. 2000) (citing *Allison*, 151 F.3d at 415) (expressing "concern" that "plaintiffs may attempt to shoehorn damage actions into the Rule 23(b)(2) framework, depriving class members of notice and opt-out protections.").